WETHERELL, J.
Florida Insurance Guaranty Association, Inc. (FIGA), appeals the final summary judgment ordering it to pay approximately $237,000 directly to Tammy Bernard for sinkhole loss to her home. FIGA argues that the trial court erred in determining that its liability for this loss was governed by the 2010 definition of “covered claim” in section 631.54(3), Florida Statutes, rather than the more restrictive definition in the 2011 version of the statute. We agree. Accordingly, we reverse the final summary judgment.
Factual and Procedural Background
Bernard’s home was insured under a homeowner’s policy issued by First Home Insurance Company (First Home) on May 28, 2010. The policy covered structural damage to the home caused by sinkhole activity, but limited First Home’s obligation to pay for any necessary subsurface repairs until Bernard entered into a contract for the performance of the repairs.[1] Accordingly, unless and until Bernard entered into a contract for the performance of the subsurface repairs, First Home was only obligated to pay Bernard for what the parties refer to as the cosmetic or above-ground repairs costs.
On November 20, 2010, while the policy was in full force and effect, Bernard dis *1025 covered damage to the walls and floors of her home. Bernard submitted a claim to First Home in December 2010, and First Home retained an engineering firm to conduct a geotechnical investigation to determine the cause of the damage. The investigation determined that the damage to Bernard’s home was consistent with damage caused by sinkhole activity and recommended subsurface remediation and other repairs. First Home nevertheless denied the claim, and in October 2011, Bernard filed a breach of contract action against First Home’s successor-by-merger, Home-Wise Insurance Company (HomeWise).
On November 18, 2011, a Consent Order was entered by the Leon County Circuit Court adjudicating HomeWise insolvent and appointing the Department of Financial Services as the receiver of HomeWise for purposes of liquidation. The order stayed all pending litigation against Home-Wise, including Bernard’s suit, and also triggered FIGA’s obligations under part II of Chapter 631, Florida Statutes (“the FIGA Act”).
In January 2012, FIGA informed Bernard that it would be handling her sinkhole claim. FIGA subsequently invoked the “neutral evaluation” dispute resolution process in section 627.7074, Florida Statutes, to determine whether the damage to Bernard’s home was caused by sinkhole activity and, if so, what remediation and repairs were necessary. In December 2012, the neutral evaluator determined that sinkhole activity could not be ruled out as a cause for the damage to Bernard’s home and found that the necessary repair costs included approximately $170,000 for subsurface remediation and approximately $57,000 for cosmetic repairs.
While the neutral evaluation process was underway, Bernard filed an amended complaint substituting FIGA for HomeWise as the defendant. The amended complaint alleged that the damage to Bernard’s home was a “covered claim” for purposes of the FIGA Act and that FIGA breached its statutory obligations by not paying the claim. FIGA’s answer denied the allegation that the claim submitted by Bernard was a “covered claim” under the FIGA Act and asserted as an affirmative defense that FIGA was only obligated to make payment “to the eontractor(s) of the policyholder’s choice, not the policyholder.”
In January 2013, FIGA notified the trial court and Bernard that it intended to comply with the recommendation of the neutral evaluator. However, FIGA took the position that it was not obligated to make payment directly to Bernard and that it would only make payment to the contractor selected to perform the repairs recommended by the neutral evaluator.
Shortly thereafter, Bernard filed a motion for partial summary judgment seeking a determination that FIGA was obligated to pay the above-ground repair costs directly to her in accordance with the terms of her insurance policy. The motion did not seek direct payment of the subsurface repair costs, and as Bernard’s counsel candidly acknowledged at oral argument, her insurance policy did not require direct payment of those costs.
The motion argued, among other things, that the 2010 statutory definition of “covered claim” in effect when the policy was issued and when the loss occurred did not prohibit FIGA from making payments directly to her. FIGA filed a response and cross-motion for summary judgment in which it argued that its obligations were not triggered until November 18, 2011, when HomeWise was adjudicated insolvent and that the 2011 definition of “covered claim” in effect at that time prohibits it from making any payment directly to Bernard.
*1026 After a hearing, the trial court granted Bernard’s motion and denied FIGA’s cross-motion. The court found that FIGA had accepted coverage of the sinkhole loss and the findings of the neutral evaluator concerning the cost of the necessary repairs and explained that the only remaining issue was whether the 2010 or 2011 statutory definition of “covered claim” applied. The court rejected FIGA’s argument that the 2011 definition applied and instead found “as a matter of law that [Bernard] is entitled to payment of amounts due on a ‘covered claim,’ as defined by Section 631.54(3), Fla. Stat. (2010), and which are due to be paid directly to [Bernard] in accordance with the loss payment provisions of [her] Policy as well as the [FIGA] Act.” The court entered judgment in favor of Bernard for approximately $237,000, which included both the above-ground and subsurface repair costs.[2] This appeal followed.[3]
Analysis
The FIGA Act was enacted by the Legislature in 1970 and was patterned after a Model Act promulgated by the National Association of Insurance Commissioners. See Nat. Ass’n of Ins. Comm’rs, Post-Assessment Prop. & Liab. Ins. Guar. Model Act (1969); see also ch. 70-20, Laws of Fla.; O’Malley v. Fla. Ins. Guar. Ass’n, 257 So.2d 9 (Fla.1971). A purpose of the FIGA Act is to “[p]rovide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer.” § 631.51(1), Fla. Stat. Thus, “when an insurer becomes insolvent, FIGA becomes obligated to respond to covered claims that arise prior to adjudication of the insurer’s insolvency and within a specified time after insolvency.” Fla. Ins. Guar. Ass’n, Inc. v. Devon Neighborhood Ass’n, 67 So.3d 187, 189 (Fla.2011). However, “the full gamut of a defunct insurance company’s liabilities was not intended to be shifted onto FIGA.” Id. at 190 (quoting Fla. Ins. Guar. Ass’n, Inc. v. Olympus Ass’n, Inc., 34 So.3d 791, 794 (Fla. 4th DCA 2010)); Williams v. Fla. Ins. Guar. Ass’n, Inc., 549 So.2d 253, 254 (Fla. 5th DCA 1989).
The FIGA Act created FIGA in section 631.55, Florida Statutes, and established its powers and duties in section 631.57. The latter statute provides in pertinent part that FIGA “shall [b]e obligated to the extent of the covered claims existing [p]ri- or to adjudication of insolvency and arising within 30 days after the determination of insolvency.” § 651.57(l)(a)l.a., Fla. Stat. (emphasis added). The term “covered *1027 claim” is specifically defined in the FIGA Act, and because FIGA is a creature of statute, it is not responsible for claims that do not fall within this statutory definition. Devon Neighborhood Ass’n, 67 So.3d at 190 (“FIGA is strictly a creature of statute. Thus, the statutory language defines the extent of FIGA’s obligations. FIGA is not responsible for claims against an insurer that do not fall within FIGA’s statutory obligations.”) (internal quotes and citations omitted); see also Petty v. Fla. Ins. Guar. Ass’n, Inc., 80 So.3d 313, 317 (Fla.2012) (holding that FIGA was not responsible for paying attorney’s fees under section 627.428(1), Florida Statutes, because such fees were not expressly authorized by the insurance policy issued by the insolvent insurer and, thus, did not fall within the statutory definition of “covered claim”).
The general principles stated above are not in dispute in this case. Indeed, the only issue in this case is whether FIGA’s obligations are governed by the definition of “covered claim” in effect when the insurance policy was executed or when the loss occurred (here, the 2010 definition), or the definition in effect when the insurer was adjudicated insolvent (here, the 2011 definition). This is a pure issue of law, which we consider de novo. See Major League Baseball v. Morsani, 790 So.2d 1071, 1074 (Fla.2001) (“The standard of review governing a trial court’s ruling on a motion for summary judgment posing a pure question of law is de novo.”).
The 2010 definition of “covered claim” provided:
“Covered claim” means an unpaid claim, including one of unearned premiums, which arises out of, and is within the coverage, and not in excess of, the applicable limits of an insurance policy to which this part applies, issued by an insurer, if such insurer becomes an insolvent insurer and the claimant or insured is a resident of this state at the time of the insured event or the property from which the claim arises is permanently located in this state. For entities other than individuals, the residence of a claimant, insured, or policyholder is the state in which the entity’s principal place of business is located at the time of the insured event. “Covered claim” shall not include:
(a) Any amount due ... as subrogation, contribution, indemnification, or otherwise; or
(b) Any claim that would otherwise be a covered claim under this part that has been rejected by any other state guaranty fund ....
§ 631.54(3), Fla. Stat. (2010). The definition was amended effective May 17, 2011, to add a new paragraph (c), which reads:
(c) Any amount payable for a sinkhole loss other than testing deemed appropriate by the association or payable for the actual repair of the loss, except that the association may not pay for attorney’s fees or public adjuster’s fees in connection with a sinkhole loss or pay the policyholder. The association may pay for actual repairs to the property but is not liable for amounts in excess of policy limits.
Ch. 2011-39, § 30, Laws of Fla. (codified at § 631.54(3)(c), Fla. Stat. (2011))(empha-sis added).[4]
*1028 The only relevant difference between the 2010 and 2011 definitions for purposes of this case is that the 2011 definition prohibits FIGA from paying the policyholder directly for sinkhole loss, whereas the 2010 definition included no such restriction. Accordingly, if the 2011 definition applies in this case, the trial court erred in ordering FIGA to pay the $237,000 in repair costs directly to Bernard and the final summary judgment must be reversed. If, however, the 2010 definition applies, the judgment must be affirmed because FIGA did not challenge any other aspect of the award to Bernard. See footnote 3.
FIGA contends that the 2011 definition applies because that was the version in effect when its statutory obligations were triggered by the insolvency of HomeWise, and prior to that event, Bernard did not have a cause of action against FIGA for payment of a “covered claim” since such claims are contingent upon the insolvency of the insurer. Bernard responds that the 2010 definition applies because that was the version in effect when she executed the insurance policy and on the date of her covered loss, and there is no indication that the Legislature intended the 2011 amendment to the definition of “covered claim” to apply retroactively. FIGA replies that the 2011 amendment is not being applied retroactively in this ease because Bernard’s cause of action against FIGA did not accrue until HomeWise was adjudi-eated insolvent, which occurred after the effective date of the 2011 amendment.
The parties have not cited, nor has our research located any Florida appellate decision expressly addressing the narrow issue presented in this case. However, this issue has been addressed by courts in other states that adopted the Model Act upon which the FIGA Act was based, and those courts have uniformly held that the definition of “covered claim” in effect when the insurer is adjudicated insolvent is the applicable definition.
For example, in Prejean v. Dixie Lloyds Insurance Co., 660 So.2d 836 (La.1995), the Louisiana Supreme Court held that the Louisiana Insurance Guaranty Association (LIGA) was not obligated to pay court costs because, after the date of accident but before the insurer was declared insolvent, the statutory definition of “covered claim” was amended to exempt LIGA from paying court costs. The court initially determined that the amended definition could not be applied retroactively,[5] but on rehearing, the court agreed with LIGA’s argument that the amended definition was not being applied retroactively because it took effect before the insurer was adjudicated insolvent. Id. at 837. The court explained:
[LIGA] argues that the law in effect on the date of the insurer’s insolvency, rather than the law in effect on the date of the accident, should be employed to determine its liability for court costs.
*1029 LIGA asserts that the statute operates prospectively here since [the insurer] was not declared insolvent until May 17, 1993, over two years after the statute became effective. We agree.
The determinative point in time separating prospective from retroactive application of an enactment is the date the “cause of action” accrues. In Louisiana, a cause of action accrues when a party has a right to sue.
Applying these principles, [the insured] acquired the right to sue [the insurer], but not LIGA, on the date of the accident, September 4, 1989. [the insured]’s cause of action against LIGA did not exist until [the insurer] was declared insolvent, on May 17,1993.
Accordingly, we find that LIGA’s obligation to pay court costs is governed by the law in effect on the date that the insurer is declared insolvent, not by the law in effect on the date of the event giving rise to the insurer’s liability.
Id. at 837-38 (citations omitted); accord Duhon v. United Pac. Ins. Co., 978 So.2d 964, 967 (La.Ct.App.2007) (“The applicable law governing claims against LIGA is the law in effect on the date of the insurer’s insolvency. The reason for this is that the claim against LIGA does not accrue until the insurer is declared insolvent.”) (citations omitted).
Similarly, in Agency Budget Corp. v. Washington Insurance Guaranty Ass’n, 93 Wash.2d 416, 610 P.2d 361 (1980), the Washington Supreme Court held that the Washington Insurance Guaranty Association (WIGA) was not obligated to pay claims for unearned premiums because the statutory definition of “covered claim” in effect at the time of the insurer’s insolvency excluded such claims from coverage. The definition was amended after the insolvency to include certain unpaid premiums, but the court held that the amendment did not apply retroactively in that case because “the right to claim unearned premiums is created by the adjudication of insolvency” and “[t]hat same event determines the liability of [WIGA] to pay those claims.” Id. at 364.; see also id. (agreeing with WIGA’s argument that the “precipitating event in this case is ... the adjudication of insolvency”).
Likewise, in Durish v. Channelview Bank, 809 S.W.2d 273, 275 (Tex.Ct.App.1991), a Texas intermediate appellate court held that “[t]he date for determining whether a claim is a covered claim under the [Texas Guaranty Act] is the date of impairment.[6] The circumstances of Durish are analogous to this case because there, as here, the trial court granted summary judgment in favor of the insured, the Bank, on its claim that the Texas guaranty association violated its statutory duties by not paying a claim the Bank submitted to its insurer, Union Indemnity, prior to a 1985 statutory amendment eliminating coverage under the Texas Guaranty Act for the claim at issue. Id. at 274-75. On appeal, the Receiver representing the guaranty association argued that the Bank’s claim was subject to the post-1985 version of the Texas Guaranty Act in effect when the insurer was declared an “impaired insurer,” and the Bank argued that its claims against the association were governed by the pre-1985 version of the Act in effect when it made a demand to its insurer for payment of the claim. Id.
The appellate court rejected the Bank’s argument, explaining:
*1030 The Bank argues that its demand on Union Indemnity was sufficient to constitute a covered claim that accrued before June 15, 1985, and thus, the savings clause[7] preserved the Bank’s claims against the Association under the pre-1985 version of the Act.
We disagree. The date for determining whether a claim is a covered claim under the Act is the date of impairment. Our conclusion is based upon our understanding of the text, the structure of the Act, and the relevant case law. The primary object of the Act is to provide funds in addition to assets of impaired insurers for the protection of the holders of covered claims. Act § 2 (1981). The Act does not purport to cover all circumstances in which insureds attempt to recover claims against insolvent insurers. The Act sets forth several criteria for coverage and carves out numerous exceptions. It is apparent from the definitional section that a prerequisite for any covered claim is that the insurer be impaired:
“Covered claim’’ is an unpaid claim of an insured or third party liability claimant which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Act applies, ... if such insurer becomes an “impaired insurer’’ after the effective date of this Act and (a) the third party claimant or liability claimant or insured is a resident of this State at the time of the insured event; or (b) the property from which the claim arises is permanently located in this State.
Act § 5(2) (Supp.1991) (emphasis added).
Section 5(2) is particularly important because the definition of a term in the definitional section of a statute controls the construction of that term wherever it appears in the statute.The Bank argues that the word “becomes” suggests that the legislature anticipated the existence of covered claims before impairment. We reject this explanation. The use of the word “becomes” denotes that the Act does not apply to insurance companies in receivership or conserva-torship before the effective date of the Act. The significant words in this subsection are “if’ and “after.” Unless the insurer becomes an impaired insurer after the effective date, an otherwise eligible claim is not a covered claim within the meaning of the Act.
The only case construing this section holds that an otherwise eligible claim is not a covered claim for the purposes of the Act unless the insurer is impaired. “The plain language of § 5(2) ... limits ‘covered claims’ for unearned premiums to persons who were residents of Texas when the policy of insurance was issued or who are residents at the time the insurance company is found to be an ‘impaired insurer.’” Central Bank v. Harris, 623 S.W.2d 807, 810 (Tex.App.1981, no writ) (emphasis added). See also Louisiana Guar. Ass’n v. Guglielmo, 276 So.2d 720, 726 (La.Ct.App.1973) (decreeing an insurer insolvent as the sole operative factor upon which the Association’s liability attaches); Mississippi Ins. Guar. Ass’n v. Gandy, 289 So.2d *1031 677, 682 (Miss.1973) (controlling factor held to be the insolvency of the insurance company after the effective date of the act, not when the claims arose) (both construing similar statutes).
Id. at 275-76 (footnotes omitted and italics in original). Accord John H. Carney & Assoc. v. Tex. Prop. & Cas. Ins. Guar. Ass’n, 354 S.W.3d 843, 844 n. 1 (Tex.Ct. App.2011) (“[A]ll references to the Guaranty Act are based on the 2006 version of the law, the law in effect when [the insurer] went into receivership.”); Campos v. Tex. Prop. & Cas. Ins. Guar. Ass’n, 282 S.W.3d 226, 228 n. 1 (Tex.Ct.App.2009) (“We apply the Texas Property and Casualty Insurance Guaranty Act in effect on October 2001, when the worker’s compensation carrier became an impaired insurer.”). Moreover, with respect to the Bank’s argument that the date of impairment was irrelevant to the date that its claim accrued against the association, the court explained:
We reject this contention beeause[, under the savings clause in the 1985 legislation,] the claim must have accrued as to the Association before the effective date of the amendment and only claims that were covered claims within the meaning of the statute could accrue against the Association.
[[Image here]]
As we construe the Act, on June 14, 1985, the Bank had no claim against the Guaranty Fund, but only an expectancy that if the insurer became impaired, then it might have a covered claim against the Fund at that time. On June 15, that expectancy was cut off by the amendment to the Act.
Durish, 809 S.W.2d at 277 (emphasis in original).
Finally, in Brennan v. Kansas Insurance Guaranty Ass’n, 293 Kan. 446, 264 P.3d 102 (2011), the Kansas Supreme Court considered whether the definition of “covered claim,” as amended in 2005, applied where the claim arose in 1999 and the insurer was adjudicated insolvent in 2002. The 2005 definition, unlike the version in effect in 2002, allowed the Kansas Insurance Guaranty Association (KIGA) to offset its liability with amounts paid by a claimant’s other insurance, thereby reducing the amount payable to the claimant. Id. at 108. The court held that the 2005 definition could not be retroactively applied because it abolished the claimant’s vested right under the Act in effect when the insurer was adjudicated insolvent. Id. at 113-14. Of particular relevance to this case, the court observed that the claimant’s “statutory right [against KIGA] arose at the time [the insurer] was declared insolvent,” id. at 114, and that “if [the insurer's insolvency had occurred after the 2005 amendment became law, the offset in controversy here would not present a due process issue ....” Id. at 109.
We find the analysis in these cases persuasive,[8] and consistent with the holdings in these cases, we hold that the statutory definition of “covered claim” in effect at the time the insurer is adjudicated insolvent determines the scope of FIGA’s liability under the FIGA Act. Accordingly, in this case, the 2011 definition applies.
In reaching this conclusion, we did not overlook the Florida Supreme Court’s decision in Devon Neighborhood Association, supra. However, we find Bernard’s reliance on that case to be misplaced.
Devon Neighborhood Association arose out of hurricane damage claims made by a *1032 neighborhood association under a 2004 insurance policy. See 67 So.3d at 189. After the insurer became insolvent in April 2006, FIGA became responsible for paying the claims. Id. at 190. FIGA paid the initial claim, but after the neighborhood association submitted supplemental claims, FIGA demanded an appraisal of the loss under the terms of the policy. Id. The neighborhood association objected to the appraisal based upon a 2005 statute that required the insurer to give notice of its right to participate in mediation as a prerequisite to the insured having to participate in the appraisal process. Id. The trial court agreed with the neighborhood association and denied FIGA’s motion to compel the appraisal. Id. at 191. The Fourth District affirmed, rejecting FIGA’s constitutional argument that the 2005 statute could not be retroactively applied to the 2004 policy at issue in that case. Id.
FIGA sought review in the Florida Supreme Court based upon conflict with several decisions concerning the proper test to be used in determining whether a statute can be applied retroactively. Id. at 189 (citing the conflict decisions establishing the Court’s jurisdiction). Thus, the narrow issue presented in Devon Neighborhood Association was whether the Fourth District applied the proper test in determining that the 2005 statute was retroactive. Id. at 189, 193-94. The Court quashed the Fourth District’s decision, “agree[ing] with FIGA ... that the district court misapplied this precedent in analyzing the question of retroactivity based solely on the second prong of the test.” Id. at 194.
Bernard contends that Devon Neighborhood Association supports her argument that the 2010 definition of “covered claim” applies in this case because, in the course of its analysis, the Court cited Menendez v. Progressive Express Insurance Co., 35 So.3d 873 (Fla.2010), for the proposition that “the statute in effect at the time an insurance contract is executed governs substantive issues arising in connection with that contract.” Devon Neighborhood Association, 67 So.3d at 195 n. 7 (internal quotation omitted). Additionally, Bernard points out that there would have been no reason for the Court to even discuss the issue of retroactivity if claims against FIGA were governed by the statutes in effect at the time of the insurer’s insolvency because the 2005 statute at issue in that case was adopted prior to the adjudication of insolvency in 2006. We are not persuaded by these arguments.
First, the citation to the general rule reaffirmed in Menendez was included in a footnote in the part of the Court’s opinion discussing the second prong of the retro-activity test. That discussion was effectively dicta because the Court ultimately concluded that there was no evidence of legislative intent that the 2005 statute be applied retroactively and, thus, it was unnecessary for the Court to consider whether, under the second prong of the retroac-tivity test, it would be constitutional to apply the 2005 statute in that case. Id. at 197 (“Because we have reached this conclusion under prong one of the two-prong test, we need not address whether retroactive application of the amendments would be constitutional.”).
Second, it appears that both the Fourth District and the Florida Supreme Court simply assumed that the application of the 2005 statute would be retroactive because the case involved a 2004 insurance policy. There is nothing in the courts’ opinions suggesting that either court was asked to consider whether the 2005 statute was being applied prospectively, and not retroactively, because FIGA’s responsibilities were not triggered until 2006 when the insurer was adjudicated insolvent. And, because that issue was not squarely presented, the Florida Supreme Court’s opin *1033 ion cannot be read to have held — implicitly or otherwise — that the applicable statute in determining the scope of FIGA’s obligations is the statute in effect when the policy was executed rather than the statute in effect when the insurer is adjudicated insolvent. Indeed, such a reading would create a potential conflict between Devon Neighborhood Association and Petty because, in Petty, the Court cited the 2008 definition of “covered claim” in a case involving a 2004 date of loss. See 80 So.3d at 315.[9]
Third, unlike this case, the Court did not need to determine in Devon Neighborhood Association if the claim at issue was a “covered claim” under the FIGA Act because FIGA had already accepted responsibility for the claim. See 67 So.3d at 190. And, having done so, FIGA was deemed to be the insurer to the extent of the covered claims and it could take advantage of the insurer’s rights and defenses under the policy. Indeed, it is noteworthy that the statute at issue in that case — section 627.7016, Florida Statutes — impacted FIGA’s rights under the policy, not its obligations or duties under the FIGA Act.
We also have not overlooked Bernard’s argument that claims against FIGA should be governed by the general rule, most recently reaffirmed by the Florida Supreme Court in Menendez, that “the statute in effect at the time an insurance contract is executed governs substantive issues arising in connection with that contract.” 35 So.3d at 876. We find that rule inapplicable here because it is derived from cases involving contractual claims under an insurance policy, which are logically, and constitutionally, governed by the law in effect at the time of the contract. See generally Lumbermens Mut. Cas. Co. v. Ceballos, 440 So.2d 612, 613 (Fla. 3d DCA 1983) (explaining that the application of a statute to insurance contracts entered into prior to the date the statute took effect “would constitute a legislative impairment of contract in violation of article I, section 10 of the Florida Constitution”). By contrast, because the FIGA Act exists as a matter of legislative grace and claims against FIGA are statutory claims based upon its alleged failure to meet its obligations under the FIGA Act, the insured has no cause of action against FIGA that would be protected against changes to the FIGA Act until the insurer is adjudicated insolvent. See Durish, 809 S.W.2d at 277 (explaining that, prior to insolvency, an insured only has an “expectancy that ... it might have a covered claim” against the *1034 guaranty association if the insurer becomes insolvent, but that expectancy can be “cut off’ by statutory amendments that take effect prior to the insurer being adjudicated insolvent).
Finally, we have not overlooked Bernard’s argument that FIGA’s liability cannot be governed by the definition of “covered claim” in effect at the time the insurer is adjudicated insolvent because section 631.57(l)(a)l.a., Florida Statutes, provides that FIGA is obligated to the extent of “the covered claims existing [pjrior to adjudication of insolvency.” Read literally, this statute appears to provide support for Bernard’s argument because if “covered claims”' can “exist” prior to insolvency, then the scope of such claims logically should be based on the statutory definition in effect at the time of their existence. However, because that interpretation would essentially read the insolvency requirement out of the statutory definition of “covered claim,” we agree with FIGA that the better reading of section 631.57(l)(a)l.a. is that it merely provides a temporal limitation on the claims that FIGA is obligated to pay, but such claims still have to meet the statutory definition of “covered claim” in effect when FIGA’s obligations are triggered by the insurer’s insolvency. See id. (explaining “covered claims” cannot accrue prior to impairment because “a prerequisite for a claim to be a covered claim is that the Commissioner [of Insurance] declare the insurer to be impaired”).[10]
Conclusion
In sum, for the reasons stated above, we hold that the statutory definition of “covered claim” in effect at the time the insurer is adjudicated insolvent determines the scope of FIGA’s liability. Accordingly, we reverse the final summary judgment in this case because the trial court erred in applying the 2010 definition rather than the more restrictive 2011 definition in effect at the time HomeWise was adjudicated insolvent, and we remand for entry of an order granting FIGA’s motion for summary judgment and for any further proceedings that may be necessary.
REVERSED and REMANDED.
ROBERTS and OSTERHAUS, JJ., concur.

. The policy provided in pertinent part:
PERILS INSURED AGAINST
[[Image here]]
Sinkhole Activity
We insure for direct physical loss to property ... caused by a “sinkhole loss,” including the costs to:
a. Stabilize the land and building; and, or
b. Repair the foundation:
In accordance with the recommendations of the professional engineer who verifies the presence of a "sinkhole loss” ....
[[Image here]]
Sinkhole loss means:
Structural damage to the building, including the foundation, caused by sinkhole activity. Contents coverage shall apply only if there is structural damage to the building caused by sinkhole activity.
[[Image here]]
Loss Settlement
[[Image here]]
In the event of sinkhole activity:
(i)We will limit our payment to the actual cash value of the covered sinkhole loss, not including underpinning or grouting or any other repair technique performed below the existing foundation of the building, until you enter into a contract for the performance of building stabilization or foundation repairs.
(ii) After you enter into the contract, we will pay the amounts necessary to begin and perform such repairs as the work is performed and expenses are incurred. We shall not require you to advance payment for such repairs.
(iii) If repair had begun and the professional engineer selected or approved by us determines that repair cannot be completed within the policy limits:
We must either complete the professional engineer's recommended repair or tender the policy limits to you without a reduction for the repair expenses incurred.
* * *
Loss Payment.
We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment.

. The trial court explained that the amount of the judgment "represents $69,774.63 in cosmetic repair costs as well as the additional [subsurface] remediation costs outlined in the Neutral Evaluation Report less the applicable policy deducible and statutory FIGA deductible” and that the $69,774.63 in cosmetic repair costs was the amount determined by the neutral evaluator (approximately $57,000) plus "profit, overhead and sales tax.” Neither party has challenged the amounts stated in the judgment.

. Inexplicably, FIGA did not file a motion for rehearing in the trial court challenging the directive that it pay the subsurface repair costs directly to Bernard even though (1) Bernard did not seek payment of such costs in her motion for partial summary judgment, and (2) Bernard’s policy expressly precluded payment for the subsurface repair costs unless and until she contracted for the performance of the repairs. Cf. State Farm Fla. Ins. Co. v. Phillips, 134 So.3d 505 (Fla. 5th DCA 2014) (reversing order requiring insurer to pay subsurface repair costs because the policy gave the insurer the authority to withhold payment for such costs until the insured contracted for the repairs).

. The creation of section 631.54(3)(c) was one of a number of provisions in chapter 2011-39 intended to ensure that sinkhole insurance claim proceeds are actually used to remediate the sinkhole damage and repair the property. See ch. 2011-39, § 21, Laws of Fla. (making legislative finding concerning the adverse impact of sinkhole claims on the public health, safety and welfare, including the finding that "many properties remain unrepaired even after loss payments, which reduces the local property tax base and adversely affects the *1028 real estate market”); id. at §§ 22-27 (amending various provisions of the Insurance Code pertaining to the investigation and payment of sinkhole claims); see also Fla. S. Comm, on Rules, CS for CS for CS for SB 408 (2011) Staff Analysis, at 9 (Apr. 7, 2011) (available at http://www.flsenate.gov/Session/Bill/2011/ 0408/Analyses/201 ls0408.rc.PDF) (noting that there had been a substantial increase in both the number and cost of sinkhole insurance claims and explaining that representatives of the Florida Office of Insurance Regulation and the insurance industry believed that "a major driving force” for the increase is the fact that "many policyholders are incentivized to file such claims because they can keep the cash proceeds from the claim instead of effectuating repairs to their home or remediating the land”).

. Prejean v. Dixie Lloyds Ins. Co., 655 So.2d 303 (La.1995).

. The Texas Guaranty Act uses the term "impairment” rather than “insolvency,” but the terms appear to have the same meaning. Compare § 462.004(5), Tex. Ins. Code (defining "impaired insurer”) with § 631.54(6), Fla. Stat. (defining "insolvent insurer”).

. The savings clause in the 1985 legislation amending the Texas Guaranty Act provided that “[c]overed claims that accrue before the effective date of this Act are governed by the law as it existed at the time the covered claim accrued ....” Id. at 275 (quoting 1985 Tex. Gen. Laws, ch. 904, § 6, at 3032). However, the court explained that "only claims that were covered claims within the meaning of the statute could accrue against the Association" and that "a prerequisite for a claim to be a covered claim is that the Commissioner [of Insurance] declare the insurer to be impaired.” Id. at 277.

. See Ulloa v. CMI, Inc., 133 So.3d 914 (Fla.2013) (‘'[I]n interpreting a statute modeled after a uniform law, it is pertinent to resort to the holdings in other jurisdictions where the act is in force.'') (internal quotations omitted)

. We recognize that the opinion in Petty did not contain any analysis of the applicable version of the statutory definition, but as FIGA argued in its briefs, the Court's citation of the 2008 statute rather than the 2004 statute could be viewed as an implicit holding that the governing statute is not the version in effect on the date of the loss. However, as was the case in Devon Neighborhood Association, we are not persuaded that Petty has any significance to our consideration of the narrow issue in this case because it does not appear that there was any dispute in Petty concerning the applicable statute, either because the issue was not raised or because there was no material difference between the statutory definition in effect on the date of the loss and the definition in effect when the insurer was adjudicated insolvent. The same is true of the other cases relied on by FIGA in its briefs. See Jones v. Fla. Ins. Guar. Ass’n, 908 So.2d 435 (Fla.2005) (citing, without analysis, the 1995 version of FIGA Act in a case involving a May 1994 date of loss and a December 1994 insolvency); Fla. Ins. Guar. Ass'n v. Olympus Ass’n, Inc., 34 So.3d 791 (Fla. 4th DCA 2010) (citing, without analysis, the 2008 version of FIGA Act in a case involving a 2005 policy and date of loss and a 2006 insolvency); Fla. Ins. Guar. Ass’n v. All The Way With Bill Vernay, Inc., 864 So.2d 1126 (Fla. 2d DCA 2003) (citing, without analysis, the 2002 definition of "covered claim” in a case involving an April 2000 date of loss); but see Williams v. Fla. Ins. Guar. Ass’n, 549 So.2d 253 (Fla. 5th DCA 1989) (citing, without analysis, the 1983 version of the FIGA Act in a case involving a 1985 insolvency).

. We are aware of cases from other states relying on language similar to that in section 631.57(l)(a)l.a., Florida Statutes, to hold that claims arising prior to the effective date of the guaranty act can be "covered claims” because the statutory definition of that term merely "categorize[s] the class or nature of claims covered, and [does] not [] fix the time when claims shall arise as a condition precedent to their falling into the classification of covered claims.” La. Ins. Guar. Ass'n v. Guglielmo, 276 So.2d 720, 726 (La.Ct.App.1973), cert denied, 279 So.2d 690 (La.1973); see also Tenn. Ins. Guar. Ass'n v. Pack, 517 S.W.2d 526, 528 (Tenn.1974); Miss. Ins. Guar. Ass'n v. Gandy, 289 So.2d 677, 682 (Miss.1973); but see Smith v. Ohio Valley Ins. Co., 27 Ohio St.2d 268, 272 N.E.2d 131, 136 (1971) (holding that the Ohio Guaranty Act. does not apply to claims that pre-dated the effective date of the Act because the statutory definition of "covered claim” refers to unpaid claims in the present tense ("which arise”), not the past tense ("which arose”)). However, we find these cases distinguishable because they did not directly address the issue framed by this appeal — l.e., whether the association’s liability is governed by the definition of “covered claim” in effect on the date of the loss or the date the insurer is adjudicated insolvent — and when that issue was addressed in one of these states, the state supreme court expressly held that the guaranty association’s obligation to pay a claim is governed by the "law in effect on the date that the insurer is declared insolvent, not by the law in effect on the date of the event giving rise to the insurer’s liability.” Prejean, 660 So.2d at 837.