NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

FLORIDA INSURANCE GUARANTY )
ASSOCIATION, )
 )
   Appellant, )
 )
v. )   Case No. 2D13-3543
 )
LEANDRO de la FUENTE and )
ANA DELIA GARCIA, )
 )
   Appellees. )
_____ )

Opinion filed January 7, 2015.

Appeal from the Circuit Court for
Hillsborough County; Christopher C.
Sabella, Judge.

G. William Bissett, Jr. of Kubicki Draper,
P.A., Miami, for Appellant.

Robert E. Biasotti and Annette Marie
Lang of Biasotti and Associates,
St. Petersburg, for Appellees.


WALLACE, Judge.

   Florida Insurance Guaranty Association (FIGA) appeals an amended final

judgment requiring it to pay $130,600—the amount of an appraisal award for a sinkhole

loss—directly to Leandro de la Fuente and Ana Delia Garcia (the insureds).  FIGA

argues that the circuit court erred in applying the statutory definition of "covered claim"

in effect when the insurance policy was issued to determine the scope of its liability instead of the more restrictive definition in effect when the insurer was adjudicated to be insolvent. We agree. Accordingly, we reverse the amended final judgment and the order confirming the appraisal award. We also certify the legal issues presented by this case to the Florida Supreme Court as questions of great public importance.

## I. THE FACTUAL AND PROCEDURAL BACKGROUND

HomeWise Preferred Insurance Company (HomeWise) issued a homeowners' insurance policy to the insureds covering their residence in Tampa. The period covered by the policy was from May 7, 2009, to May 7, 2010. The amount of coverage for the dwelling was $168,000. On or about March 1, 2010, the insureds reported a loss from sinkhole activity at their residence. HomeWise asserted that the condition at the insureds' residence was not a sinkhole loss as defined in the policy[1] and denied coverage for the claim. In November 2010, the insureds filed an action against HomeWise for breach of the policy. HomeWise answered the complaint and raised numerous affirmative defenses.

On September 2, 2011, the Leon County Circuit Court entered an order appointing the Florida Department of Financial Services as receiver for HomeWise, entering an injunction, and imposing an automatic stay in favor of HomeWise. On November 4, 2011, the Leon County Circuit Court entered an order adjudicating HomeWise to be insolvent. As a result of HomeWise's adjudication of insolvency, FIGA was activated to handle the "covered claims" (as defined by statute) of the insolvent

---

[1]The definition of "sinkhole loss" in the policy is substantially identical to the definition found in section 627.706(2)(c), Florida Statutes (2008).

insurer in accordance with sections 631.50 through 631.70, Florida Statutes (2011), the Florida Insurance Guaranty Association Act (the FIGA Act).

After HomeWise was adjudicated to be insolvent, the insureds filed an amended complaint that substituted FIGA as the defendant in place of HomeWise. FIGA answered the amended complaint, noting that its obligations were limited to the payment of "covered claims" within the meaning of the FIGA Act.

On May 16, 2012, FIGA wrote the insureds and notified them that it had determined that sinkhole activity was a cause of damage to their residence. FIGA included with its letter a report from its consultant outlining the scope of the recommended repairs and the cost of accomplishing them. FIGA offered to issue payment for ground stabilization and cosmetic repairs to the residence once the insureds provided FIGA with executed contracts with contractors for the completion of the necessary repairs. However, the insureds did not proceed with obtaining the requested contracts because their consultant disagreed with FIGA's consultant concerning the appropriate method for the repair of the residence. The method recommended by the insureds' consultant was substantially more costly than the method recommended by FIGA's consultant.[2]

The HomeWise policy included a provision for appraisal of sinkhole losses in a special endorsement. The appraisal paragraph provided:

> **6.** **Mediation or Appraisal.** If you and we fail to agree on the amount of loss, either may:
>
> a. Demand a mediation of the loss . . .

---

[2]The primary difference between the two recommended solutions for remediation was whether an injected-grout method was sufficient or whether "underpinning" was required in addition to the grouting.

> b.     Demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of the loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.
>
> Each party will:
>
> > (2) *[sic]* Pay its own appraiser; and
> >
> > (3) *[sic]* Bear the other expenses of the appraisal and umpire equally.
> >
> > . . .
>
> c.     Neutral evaluation of a "sinkhole loss" . . .

The loss payment provision of the policy provided that payment of the amount of the loss as determined by appraisal was payable to the insureds ("unless some other person is named in the policy or is legally entitled to receive payment") sixty days after the filing of an appraisal award or mediation settlement.

On November 21, 2012, the insureds' attorney made a written demand on FIGA for appraisal under the conditions of the policy. The insureds' attorney said that the disagreement between the parties' consultants concerning the appropriate method of repair to the residence "clearly evidence a documented dispute over the 'amount of loss,' and therefore, appraisal is appropriate to settle these differences." Relying on the

- 4 -

definition of "covered claim" contained in a 2011 amendment to the FIGA Act, FIGA responded that appraisal was inappropriate and declined to participate.

## II.  THE CIRCUIT COURT'S RULING

Over FIGA's objection, the circuit court ordered appraisal and compelled FIGA to participate.  On May 1, 2013, the appraisers entered their award determining the amount of the loss to be $130,600.  The appraisal award included a line item for future incurred costs for additional living expenses that was left open.  The insureds promptly filed a motion asking the circuit court to confirm the appraisal award and to enter judgment against FIGA on the award.  FIGA objected to the confirmation of the appraisal award on the ground that the definition of "covered claim" in effect when HomeWise was adjudicated insolvent applied to the insureds' sinkhole loss and should govern any payments made on the claim.  The application of the new definition of "covered claim" to the insureds' claim would prohibit any direct payment to the insureds for a sinkhole loss.

The circuit court rejected FIGA's argument and ruled that the law in effect when the policy was issued would determine the scope of FIGA's payment obligation together with the loss payment provisions in the policy.  In accordance with this ruling, the circuit court entered an amended final judgment confirming the appraisal award and entering judgment in favor of the insureds and against FIGA in the amount of $130,600. This appeal followed.

## III.  FRAMING THE ISSUES

In this case, we are called upon to decide whether the statutory definition of "covered claim" in effect at the time a homeowners' insurance policy is issued or a

more restrictive definition in effect at the time the insurer is adjudicated insolvent governs the scope of FIGA's liability under the FIGA Act. If the more restrictive definition of "covered claim" in effect when the insurer is adjudicated insolvent applies, then we must also address the question of the availability of appraisal under the terms of the policy to determine the amount of loss. The issues presented are questions of statutory construction that we review de novo. W. Fla. Reg'l Med. Ctr., Inc. v. See, 79 So. 3d 1, 8 (Fla. 2012).

## IV. DISCUSSION

The insureds argue that their rights to recover against FIGA were established and vested in May 2009 when HomeWise issued the subject insurance policy. In accordance with this view, the insureds assert that the definition of "covered claim" in the 2008 version of the FIGA Act controls the scope of their rights to recover for their sinkhole loss. On the other hand, FIGA argues "that [the insureds'] right to pursue a claim against FIGA under the FIGA Act could not arise until FIGA's statutory obligations were triggered. FIGA's statutory obligations were triggered, at the earliest, when HomeWise was declared insolvent and liquidated on November 4, 2011, pursuant to the HomeWise Liquidation Order." Based on this reasoning, FIGA concludes that the definition of "covered claim" in effect on November 4, 2011, the date of the liquidation order, governs the scope of its obligations to the insureds.

The definition of "covered claim" that was in effect when the policy was issued provided:

> "Covered claim" means an unpaid claim, including one of unearned premiums, which arises out of, and is within the coverage, and not in excess of, the applicable limits of an insurance policy to which this part applies, issued by an

- 6 -

insurer, if such insurer becomes an insolvent insurer and the claimant or insured is a resident of this state at the time of the insured event or the property from which the claim arises is permanently located in this state. For entities other than individuals, the residence of a claimant, insured, or policyholder is the state in which the entity's principal place of business is located at the time of the insured event. "Covered claim" shall not include:

(a) Any amount due . . . as subrogation, contribution, indemnification, or otherwise; or

(b) Any claim that would otherwise be a covered claim under this part that has been rejected by any other state guaranty fund . . . .

§ 631.54(3), Fla. Stat. (2008). The legislature amended the definition of "covered claim" effective May 17, 2011, by adding a new paragraph (c) to section 631.54(3). The 2011 amendment addresses the subject of claims for sinkhole losses. The new paragraph (c) provides:

(c) Any amount payable for a sinkhole loss other than testing deemed appropriate by the association or payable for the actual repair of the loss, except that the association may not pay for attorney's fees or public adjuster's fees in connection with a sinkhole loss or pay the policyholder. The association may pay for actual repairs to the property but is not liable for amounts in excess of policy limits.

Ch. 2011-39, § 30, at 584, Laws of Florida (2011) (emphasis added).

The effect of the 2011 amendment to the definition of "covered claim" is to prohibit FIGA from paying an insured directly for a sinkhole loss. Instead, FIGA may only pay a contractor for the "actual repairs to the property" for such a loss up to the amount of the policy limits and the statutory limits on FIGA's obligations to pay, whichever is less. Thus the 2011 amendment to the definition of "covered claim" is not a mere technical change; instead, the amendment substantially changes the method by

- 7 -

which sinkhole losses will be handled and paid by FIGA. Underlying the parties' legal debate in this case is a more practical disagreement, i.e., whether the insureds can compel FIGA to pay them directly for the amount of their sinkhole loss as determined by the appraisal, or whether FIGA is only obligated to pay a contractor or contractors for the cost of repairs to the property that are actually made.

The First District Court of Appeal recently addressed one of the legal issues presented by the case before us in Florida Insurance Guaranty Ass'n v. Bernard, 140 So. 3d 1023 (Fla. 1st DCA 2014), review denied, No. SC14-1416, 2014 WL 6883868 (Fla. Dec. 5, 2014). In Bernard, the First District noted the absence of any Florida appellate decisions addressing the legal issue presented. Id. at 1028. In the absence of any applicable Florida authority, the First District conducted a detailed review of the history and purpose of FIGA, the pertinent provisions of the FIGA Act, and decisions by courts from other states that have adopted the Model Act upon which the FIGA Act was based. After this extensive review, the First District concluded "that the statutory definition of 'covered claim' in effect at the time the insurer is adjudicated insolvent determines the scope of FIGA's liability under the FIGA Act." Id. at 1031. We agree with the analysis and the holding in Bernard. Accordingly, we hold that the definition of "covered claim" in effect on November 4, 2011, the date that HomeWise was adjudicated to be insolvent, governs the scope of FIGA's liability to the insureds for the sinkhole loss at their property. In accordance with this holding, we reverse the amended final judgment that requires FIGA to pay $130,600 directly to the insureds.

In addition, we reverse the amended final judgment's confirmation of the appraisal award. Under the 2011 definition of "covered claim," the policy provisions that

authorize appraisal and require payment of the appraisal award directly to the insured (or other authorized person) within sixty days of the filing of the award are inapplicable to a sinkhole loss once FIGA is activated. Absent FIGA's involvement, the contract term "amount of loss" leads directly—barring some coverage dispute—to a final settlement of the claim. But FIGA may not "settle" a sinkhole claim with an insured; it may only pay for the cost of "actual repairs." And because the process of repairing sinkhole-caused damage to a home necessarily involves several players—an engineer to determine the existence of the sinkhole and the extent of remedial work necessary to correct the problem, a contractor specializing in sinkhole remediation, and a second contractor who will perform the cosmetic (above ground) repairs—attempting to reconcile the appraisal provision with FIGA's revised obligations under the 2011 amendment to the statute creates more questions than it answers. These questions include such practical matters as to whom the check should be written, when the check should be written, and whether the check represents a final payment on the "amount of loss." Moreover, because the final cost of the cosmetic repairs cannot generally be determined with accuracy until after the remedial repairs to the structure have been completed, it follows that these costs cannot be fully taken into account when an appraisal award is made.[3] Finally, in this case, the appraisal award is not supported by any analysis or engineering

---

[3]FIGA's consultant recommended a delay of six to eight weeks after completion of the injection of grout before commencing cosmetic repairs to allow for settling. The Plaintiffs, on the other hand, obtained an estimate from a contractor for cosmetic repairs in advance. This estimate advises that it is based on visible damages at the time of inspection plus "anticipated damages" due to the proposed stabilization repairs. However, it also contains the caveat that "*if additional damages occur . . . please contact our office to schedule a follow up inspection so we can revise the estimate.*"

cost estimates and does not appear to be linked in any way to the method of repair, which is the crux of the parties' dispute in this case.[4]

Based on the above, we conclude that (1) an appraisal award, as provided for in the homeowners' policy of insurance at issue, is not the functional equivalent of "the actual repair of the loss," which is the only amount that FIGA is allowed to pay; (2) it is impractical, if not impossible, to write a single check in the amount of the appraisal award to a single entity because at least three entities are likely to be involved (engineer, remediation contractor, and cosmetic repair contractor); and (3) it is unlikely that FIGA would be able to issue a check to anyone at all within sixty days of the award because the actual cost of repairs, including cosmetic repairs, cannot be known until the work is completed,[5] and the work will almost certainly not be completed within sixty days. Accordingly, requiring FIGA to participate in the appraisal process is at odds with FIGA's statutory mandate to pay only for the actual cost of repair for a covered sinkhole loss.

In their answer brief, the insureds raise a number of questions concerning the feasibility of the new statutory scheme governing FIGA's handling of sinkhole losses. The insureds point to a number of practical problems that may arise from the new statutory scheme. We are inclined to agree with the insureds that the lack of

---

[4]The appraisal award in this case consists of nothing more than a dollar amount. In fairness to the appraisers, the award may be grounded on something more than a rough estimate or a number selected because it is somewhere near the midpoint of professional estimates prepared by others. However, a reasoned basis for the appraisal award is not evident to this court from our record.

[5]Based on our review of the estimates in the record, all of which contain caveats for unforeseen events and conditions, the final cost of a sinkhole repair will be a moving target until all of the work is completed.

- 10 -

direction in the 2011 amendment concerning how FIGA is to administer its new statutory obligations concerning payment of sinkhole losses can result in multiple issues that—absent agreement by the parties—may need to be resolved by the courts. However, no such issues are currently before us. If the insureds and FIGA are unable to resolve their differences amicably, it will be the circuit court's task initially to address such issues as may arise. We also observe that both the insureds and FIGA can choose to avail themselves of mediation or neutral evaluation to assist in reaching an agreement without additional litigation.[6]

## V. CERTIFYING QUESTIONS

The legal issues presented in this case have arisen in several other cases filed in this court. The First District has already decided the issue of the applicability of the 2011 amendment in Bernard, and we expect that other cases involving the same issues are pending or will be filed in the other district courts of appeal. It seems reasonable to assume that these issues will continue to arise in numerous cases. For this reason, we certify the following questions to the Florida Supreme Court as questions of great public importance:

> I. DOES THE DEFINITION OF "COVERED CLAIM" IN SECTION 631.54(3), FLORIDA STATUTES, EFFECTIVE MAY 17, 2011, APPLY TO A SINKHOLE LOSS UNDER A HOMEOWNERS' POLICY THAT WAS ISSUED BY AN INSURER BEFORE THE EFFECTIVE DATE OF THE NEW DEFINITION WHEN THE INSURER WAS ADJUDICATED

---

[6]One of the problems resulting from the 2011 amendment is that the homeowners will generally lack sufficient cash to pay the various contractors to start the required work. We are informed that FIGA—to its considerable credit—has addressed this problem by adopting a policy of issuing a check to the contractor for thirty per cent of the estimated cost of the repair after a contract is signed and the contractor is ready to start the job.

TO BE INSOLVENT AFTER THE EFFECTIVE DATE OF
THE NEW DEFINITION?

II. DOES THE STATUTORY PROVISION LIMITING
FIGA'S MONETARY OBLIGATION TO THE AMOUNT OF
ACTUAL REPAIRS FOR A SINKHOLE LOSS PRECLUDE
AN INSURED FROM OBTAINING AN APPRAISAL AWARD
DETERMINING THE "AMOUNT OF LOSS" IN
ACCORDANCE WITH THE TERMS OF THE
HOMEOWNERS' POLICY OF INSURANCE?

Reversed and remanded for further proceedings consistent with this opinion; questions certified.

KHOUZAM, J., and DAKAN, STEPHEN L., ASSOCIATE SENIOR JUDGE, Concur.