NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

FLORIDA INSURANCE GUARANTY          )
ASSOCIATION, INC.,                  )
                                    )
          Appellant,                )
                                    )
v.                                  )          Case No.  2D13-5780
                                    )
OSCAR LUSTRE and DALISAY LUSTRE,    )
                                    )
          Appellees.                )
                                    )

Opinion filed April 24, 2015.

Appeal pursuant to Fla. R. App. P.
9.130 from the Circuit Court for Pasco
County; W. Lowell Bray, Jr., Judge.

Hinda Klein of Conroy, Simberg, Ganon,
Krevans, Abel, Lurvey, Morrow &
Schefer, P.A., Hollywood, for Appellant.

George A. Vaka and Nancy A. Lauten of
Vaka Law Group, Tampa; and Kenneth
C. Thomas, Jr. of Marshall Thomas
Burnett, Land O'Lakes, for Appellees.

WALLACE, Judge.

        Florida Insurance Guaranty Association, Inc. (FIGA), appeals a nonfinal

order compelling appraisal concerning the repair of damages caused by a sinkhole to a

residence owned by Oscar Lustre and Dalisay Lustre (the Lustres).  Based on this

court's recent decision in <u>Florida Insurance Guaranty Ass'n v. de la Fuente</u>, 40 Fla. L. Weekly D123 (Fla. 2d DCA Jan. 7, 2015), we conclude that the circuit court erred in determining that the Lustres were entitled to appraisal of their claim. In addition, we conclude that the Lustres' activities in litigating their claim amounted to a waiver of appraisal. For these reasons, we reverse the order compelling appraisal and remand for further proceedings.

## I. THE FACTS AND PROCEDURAL BACKGROUND

The Lustres claimed to have discovered sinkhole damage to their residence on or about October 20, 2009. The Lustres' insurer, HomeWise Preferred Insurance Company, had inspected the property the previous month. As a result of its inspection, HomeWise retained a professional engineering company, BCI Engineers and Scientists (BCI), to conduct appropriate testing and investigation of the property. On December 3, 2009, BCI sent a report to HomeWise and the Lustres stating that the damage to the Lustres' residence was the result of several factors, including sinkhole activity.

HomeWise promptly wrote to the Lustres informing them of the status of their claim and providing another copy of BCI's report. HomeWise informed the Lustres that it had forwarded BCI's report to three contractors, requesting bids for the stabilization of the residence. In addition, HomeWise had requested another contractor to contact the Lustres about preparing an estimate for cosmetic repairs to the home. HomeWise informed the Lustres that they could obtain their own bids if they wished. In mid-December, several contractors presented proposals to HomeWise and the Lustres for repair of the damages. And on May 14, 2010, HomeWise tendered payment to the

Lustres "for the actual cash value of the building damages based upon [an] estimate by Paul Davis Restoration."

On April 13, 2010, the Marshall Thomas Burnett law firm notified HomeWise that it was representing the Lustres with regard to their claim. The law firm obtained a report on behalf of the Lustres from Florida Testing and Environmental, Inc. (FTE). The report from FTE disagreed with some of the recommendations from BCI with regard to the plans for remediating the sinkhole activity.

On June 18, 2010, one of the Lustres' attorneys sent a letter to HomeWise enclosing a remedial bid proposal from Urbaneering, Inc., Structural Engineering & Inspection Services based upon FTE's recommendations. Also enclosed was "a recent cosmetic scope from [Rick J Wilson & Assoc, Inc]." The attorney requested HomeWise to "tender any additional amounts that it now concedes are presently due and owing" and stated that if HomeWise did not, then the Lustres would "proceed under the assumption that HomeWise does not concede any additional monies are due."

On July 8, 2010, the Lustres' attorney sent HomeWise a letter noting that it was HomeWise's position that payment for the subsurface stabilization repairs was not yet due because the Lustres had not entered into a contract for such repairs. To that end, counsel enclosed a proposal for subsurface stabilization repairs from Champion Foundation Repair Systems (Champion), which had been executed by the Lustres. In the July 8 cover letter, the Lustres' attorney also said:

> We look forward to receiving HomeWise Preferred Insurance Company's prompt payment of [the first 30% draw] in the near future. We also look forward to receiving [HomeWise's] authorization to move forward with the protocols set forth in the enclosed, fully executed contract. <u>Should we not receive both, we will proceed under the assumption that [HomeWise]</u>

> is unwilling to comply with these requests and we will take such further legal action as we deem appropriate under the circumstances.

(Emphasis added.)

HomeWise's counsel responded by letter dated August 2, 2010, informing the Lustres' attorney that because the Champion contract was not executed by the contractor, it was not an enforceable contract rendering their loss immediately payable under the provisions of the policy. Counsel further stated, "Nonetheless, the [Champion] contract and [the] report from [FTE] is the first evidence of a dispute over the method of stabilization[,] and we are therefore requesting neutral evaluation at this time." (Emphasis added.) Counsel informed the Lustres' attorneys that HomeWise intended to comply with the recommendations of the neutral evaluator. Counsel closed the letter with the following expression of HomeWise's intent:

> It is the intention of [HomeWise] to reach agreements with you regarding the amount of loss and having the necessary work completed to restore the insured property to its pre loss condition. The carrier fully intends to pay for all covered damages that occurred during the policy period in accordance with Florida law and the policy of insurance.

On August 4, 2010, HomeWise made a formal request to the Department of Financial Services for neutral evaluation of the Lustres' claim.

On September 15, 2010, before neutral evaluation had been completed, the Lustres filed an action against HomeWise and served HomeWise with various requests for discovery. At this point, the Lustres did not demand appraisal under the terms of their policy. The parties stipulated to a stay of the action pending the completion of neutral evaluation. The neutral evaluator issued his report in January 2011. The trial court lifted the stay, and HomeWise filed its answer and affirmative

- 4 -

defenses to the complaint.  On May 11, 2011, the Lustres filed a notice stating that the case was at issue and requested that it be set for jury trial.

HomeWise was declared insolvent about six months later; as a result, the action against the insurance company was stayed.  In June 2012, the Lustres amended their complaint to substitute FIGA as the party defendant.  In its amended complaint, the Lustres reiterated their demand for a jury trial.  Thereafter, the parties continued to litigate the case.  FIGA admitted coverage for the Lustres' claim; the focus of the parties' dispute was on the method of repair.

On October 1, 2012, the Lustres filed a notice stating that the case was at issue and requested that it be set for jury trial.  In accordance with the Lustres' request, the trial court issued an order scheduling a pretrial conference for July 23, 2013, and the jury trial for the week of August 12, 2013.  On May 8, 2013, the Lustres' counsel sent a letter to FIGA requesting appraisal.  Thereafter, on July 1, 2013, approximately three weeks before the scheduled pretrial conference, the Lustres filed a motion to compel appraisal and to stay the proceedings.[1]

---

[1]In pertinent part, the Lustres made the following assertions in their motion to compel appraisal:

> 8.  [The Lustres] have submitted a signed contract for subsurface stabilization, which FIGA has failed/refused to authorize because, among other reasons, the repair protocol is more comprehensive and expensive than the recommended methodology set forth by FIGA's retained engineer.
> 9.  Likewise, [the Lustres] have submitted a general contractor's estimate that FIGA has rejected because it exceeds the estimate prepared on behalf of FIGA and/or their predecessor insolvent carrier.
> 10.  Accordingly, there is an amount of loss dispute that is ripe for contractual appraisal.

The trial court heard the motion to compel appraisal on July 23, 2013, at the scheduled pretrial conference. FIGA objected to appraisal on three grounds. First, the Lustres had waived appraisal by their actions in litigating the case. Second, the parties' dispute related to the method of repair rather than the amount of the loss; for that reason, appraisal was either unavailable or was premature. Third, appraisal was unavailable under the 2011 amendment to section 631.54(3), Florida Statutes. At the conclusion of the hearing, the trial court granted the Lustres' motion and entered an order compelling appraisal. In its order, the trial court did not make any findings of fact or of law. This appeal followed.[2]

## II. FRAMING THE ISSUES

Thus the main issues for our review are these: (1) whether under the HomeWise policy the determination of the method of repair is appropriate for resolution under the policy's appraisal process and (2) whether the Lustres waived any right to appraisal by engaging in litigation activities for an extended period before requesting appraisal. The issue of whether the Lustres were entitled to appraisal under the terms of their policy under the 2011 amendment to section 631.54(3) is controlled by this court's decision in de la Fuente.

---

Thus the dispute for which the Lustres requested appraisal with FIGA was the same dispute evidenced by the letters exchanged by counsel for the Lustres and for HomeWise between April 2010 and August 2010.

[2]We have jurisdiction under Florida Rule of Civil Procedure 9.130(a)(3)(C)(iv).

### III.  THE STANDARD OF REVIEW

With regard to an order compelling appraisal, we review the trial court's factual findings under a competent, substantial evidence standard.  Our review of the trial court's application of the law to the facts is de novo.  Where, as in this case, the trial court made no findings of fact or of law, we apply the relevant law to the facts in the record.  See Fla. Ins. Guar. Ass'n v. Castilla, 18 So. 3d 703, 704 (Fla. 4th DCA 2009) (citing United HealthCare of Fla., Inc. v. Brown, 984 So. 2d 583, 585 (Fla. 4th DCA 2008)); see also Fla. Ins. Guar. Ass'n v. Branco, 148 So. 3d 488, 493 (Fla. 5th DCA 2014) ("Here, while the trial court made no findings of fact on the issue of waiver, the facts are not in dispute.  Therefore, we review the waiver issue de novo.").  Our review of the question of the applicability of the 2011 amendment to section 631.54(3) to the Lustres' rights under the policy is a question of statutory construction that we review de novo.  See W. Fla. Reg'l Med. Ctr., Inc. v. See, 79 So. 3d 1, 8 (Fla. 2012).

### IV.  DISCUSSION

#### A.  The Method of Repair as an Appraisable Issue

As noted above, FIGA argues that the parties' dispute over the method of repair is not an appraisable issue under the Lustres' policy with HomeWise.  More specifically, it argues that the policy's appraisal provision, which only contemplates appraisal for disagreements about "the amount of loss," does not apply when the disagreement is over the method of repair, which does not constitute a disagreement over "the amount of loss" within the policy.

This court recently addressed the "amount of loss" versus "method of repair" argument in <u>Cincinnati Insurance Co. v. Cannon Ranch Partners, Inc.</u>, 40 Fla. L. Weekly D78 (Fla. 2d DCA Dec. 31, 2014). In <u>Cincinnati</u>, we stated as follows:

> In Florida, a challenge of coverage is exclusively a judicial question. However, when the insurer admits that there <u>is</u> a covered loss, any dispute on the amount of loss suffered is appropriate for appraisal. Notably, in evaluating the amount of loss, an appraiser is necessarily tasked with determining both the <u>extent</u> of covered damage and the <u>amount</u> to be paid for repairs. Thus, the question of what repairs are needed to restore a piece of covered property is a question relating to the amount of loss and not coverage. Ipso facto, the scope of damage to a property would necessarily dictate the amount and type of repairs needed to return the property to its original state, and an estimate on the value to be paid for those repairs would depend on the repair methods to be utilized. The method of repair required to return the covered property to its original state is thus an integral part of the appraisal, separate and apart from any <u>coverage</u> question.

<u>Id.</u> at D79 (alterations in original omitted) (citations omitted) (internal quotation marks omitted); <u>see also</u> <u>Branco</u>, 148 So. 3d at 492-93 (rejecting FIGA's argument that a dispute over the scope and method of repair for a covered sinkhole claim constituted a coverage issue rather than an amount of loss issue and holding that such disputes were subject to appraisal). Because there was no dispute between the parties that the subject loss was covered under the insurance policy, we concluded that the remaining dispute about the scope and method of repair fell "squarely within the scope of the appraisal process—a function of the insurance policy and not of the judicial system." <u>Cincinnati</u>, 40 Fla. L. Weekly at D79.

Similarly in this case, FIGA has accepted the Lustres' sinkhole claim; there is no coverage dispute here. The only controversy concerns the scope and method of repair. In accordance with our decision in <u>Cincinnati</u>, we conclude that this issue

concerns the amount of loss and is subject to appraisal. Accordingly, we find no reversible error based upon FIGA's argument that that parties' dispute about the method of repair is not subject to appraisal.

## B. The Question of Waiver

Alternatively, FIGA argues that the Lustres waived any entitlement to appraisal based upon their litigation activities. We agree.

"A waiver of the right to seek appraisal occurs when the party seeking appraisal actively participates in a lawsuit or engages in conduct inconsistent with the right to appraisal." Fla. Ins. Guar. Ass'n v. Rodriguez, 153 So. 3d 301, 303 (Fla. 5th DCA 2014). "[T]he primary focus is whether [the insureds] acted inconsistently with their appraisal rights." Id. (second alteration in original) (quoting Branco, 148 So. 3d at 493). In determining when appraisal becomes appropriate the Fifth District has observed as follows:

> Unlike arbitration, appraisal exists for a limited purpose—the determination of the amount of the loss. Until the insurer has a reasonable opportunity to investigate and adjust the claim, there is no disagreement (for purposes of appraisal) regarding the value of the property or the amount of loss to be appraised. An insurer that denies coverage does not need to seek appraisal before litigation because it would make no sense to say that the insurer was required to request . . . appraisal on a loss it had already refused to pay. Absent contract language to the contrary, we see no reason why the insured should not have the same flexibility in cases when coverage is denied.

Id. (alterations in original omitted) (citations omitted) (quoting Branco, 148 So. 3d at 494) (internal quotation marks omitted).

In this case, a dispute about the scope and method of repair arose between the Lustres and HomeWise as evidenced by their exchange of letters between

April and August 2010.  As a result, HomeWise requested neutral evaluation in August 2010 and notified the Lustres that it would comply with the recommendations of the neutral evaluator.  Before neutral evaluation was completed, the Lustres filed an action against HomeWise and began actively litigating their claim.  In May 2011, the Lustres requested that the case be set for jury trial.  After HomeWise was declared insolvent, the Lustres substituted FIGA as the party defendant in the litigation and recommenced actively litigating their claim.  FIGA did not deny coverage for the claim; the parties' only dispute was about the method of repair.  In October 2012, the Lustres once again requested that the case be set for trial.  The Lustres did not file their motion to compel appraisal until July 1, 2013, only three weeks before the scheduled pretrial and six weeks before the case was scheduled for jury trial.

The undisputed facts demonstrate that—despite the absence of a dispute about coverage—the Lustres actively litigated their claim for almost three years.  They asked that the case be set for jury trial twice, and they did not seek appraisal until just before the pretrial when both parties should have been in the midst of their final preparations for trial.  We are unable to discern any basis in the record for the substantial delay by the Lustres in seeking appraisal of their claim.  Under these circumstances, we conclude that the Lustres waived their right to seek appraisal under the terms of the policy.  Accordingly, the trial court erred in ordering appraisal.  See Fla. Ins. Guar. Ass'n, Inc. v. Waters, 40 Fla. L. Weekly D354, D355-56 (Fla. 2d DCA Feb. 6, 2015); Fla. Ins. Guar. Ass'n v. Reynolds, 148 So. 3d 840, 841-43 (Fla. 5th DCA 2014); Rodriguez, 153 So. 3d at 303-04; Fla. Ins. Guar. Ass'n v. Maroulis, 153 So. 3d 298, 300-01 (Fla. 5th DCA 2014); ARI Mut. Ins. Co. v. Hogen, 734 So. 2d 574, 576 (Fla. 3d

DCA 1999); <u>Gray Mart, Inc. v. Fireman's Fund Ins. Co.</u>, 703 So. 2d 1170, 1171-73 (Fla. 3d DCA 1997).

## C. *The Impact of <u>de la Fuente</u>*

We conclude that the trial court also erred in entering the order compelling appraisal based on this court's recent decision in <u>de la Fuente</u>.  The provisions in the Lustres' policy are the same as the provisions under review in <u>de la Fuente</u>.  Under the analysis in that case, the definition of "covered claim" in the 2011 amendment to section 631.54(3) is applicable, and appraisal is unavailable under the amended statute to determine the amount of loss.  <u>de la Fuente</u>, 40 Fla. L. Weekly at D124-25; <u>see also</u> <u>Waters</u>, 40 Fla. L. Weekly at D355 (citing <u>de la Fuente</u> for the foregoing proposition).

## V.  CONCLUSION

For the foregoing reasons, we reverse the order compelling appraisal and remand for further proceedings consistent with this opinion.  As we did in <u>de la Fuente</u>, we certify the following questions to the Florida Supreme Court as questions of great public importance:

> I.  DOES THE DEFINITION OF "COVERED CLAIM" IN SECTION 631.54(3), FLORIDA STATUTES, EFFECTIVE MAY 17, 2011, APPLY TO A SINKHOLE LOSS UNDER A HOMEOWNERS' POLICY THAT WAS ISSUED BY AN INSURER BEFORE THE EFFECTIVE DATE OF THE NEW DEFINITION WHEN THE INSURER WAS ADJUDICATED TO BE INSOLVENT AFTER THE EFFECTIVE DATE OF THE NEW DEFINITION?

> II.  DOES THE STATUTORY PROVISION LIMITING FIGA'S MONETARY OBLIGATION TO THE AMOUNT OF ACTUAL REPAIRS FOR A SINKHOLE LOSS PRECLUDE AN INSURED FROM OBTAINING AN APPRAISAL AWARD DETERMINING THE "AMOUNT OF LOSS" IN ACCORDANCE WITH THE TERMS OF THE HOMEOWNERS' POLICY OF INSURANCE?

Reversed and remanded for further proceedings; questions certified.


SILBERMAN, J., Concurs.
ALTENBERND, J., Concurs with opinion.


ALTENBERND, Judge, Concurring.

I concur in this opinion, including our decision that the Lustres waived appraisal. As to the alternative holding that FIGA does not need to engage in contractual appraisal of these sinkholes claims, I agree that the issue in this case is resolved by this court's holding in de la Fuente. That said, I am not entirely convinced that the statutory provisions for the processing and payment of "covered claims" by FIGA, a nonprofit corporation created to provide a quasi-governmental safety net in the event of an insurance company's insolvency, are so inconsistent with the rights of appraisal provided in the insurance contract that FIGA can avoid its duty to appraise the insurance claim under the contract. Thus, I am inclined to believe that on the second certified question in de la Fuente, 40 Fla. L. Weekly at D124-25, this court may have arrived at the wrong answer. By eliminating the duty to appraise sinkhole claims under the contract, we are apparently shifting the resolution of disputed sinkhole claims to the courts for complex and possibly lengthy jury trials.

An insurance claim on an insurance policy and a "covered claim" under chapter 631 are two distinctly different claims. FIGA provides limited protection for the public from insurance company insolvencies, as a matter of state law, in a manner somewhat similar to the protection provided by FDIC for bank insolvencies as a matter of federal law. These governmentally created entities help provide confidence in, and stability for, our economy in times of crisis. But FIGA is not a governmental insurance company that fully replaces the insolvent insurance company as the insurer on a policy. Instead, it provides a limited statutory guarantee payment, which may be based on an underlying insurance claim.

A "covered claim" is defined in section 631.54(3). In general, a covered claim may be an insurance claim that is payable under the terms of the relevant contract or a claim for the repayment of unearned premiums. See id. In the case of sinkhole coverage, the statutory definition of a covered claim is modified by complex language stating that a covered claim does not include:

> Any amount payable for a sinkhole loss other than testing deemed appropriate by the association or payable for the actual repair of the loss, except that the association may not pay for attorney's fees or public adjuster's fees in connection with a sinkhole loss or pay the policyholder. The association may pay for actual repairs to the property but is not liable for amounts in excess of policy limits.

§ 631.54(3)(c).

FIGA's powers and duties do not require that it pay everything that falls within the definition of a covered claim. Generally, it is not required to pay the first $100 of a claim, and it does not guarantee payments over $300,000 in most instances.

§ 631.57(1)(a)(2). In the case of homeowner's coverage, FIGA can cover $500,000 of damage to structure or contents. Id.

Although FIGA is not a substitute insurance company for the insolvent insurer, it is "deemed the insurer to the extent of its obligation on the covered claims, and, to such extent, shall have all rights, duties, defenses, and obligations of the insolvent insurer as if the insurer had not become insolvent." § 631.57(1)(b).

Thus, to establish the "covered claim" that is used to determine the guaranteed payment by FIGA under section 631.57, one starts with an "unpaid claim" that arises out of and is within the coverage of the relevant insurance policy. § 631.54(3). The unpaid claim is normally determined using roughly the same adjusting procedures that would have been used by the insurance company if it had not become insolvent. In this adjusting process, FIGA has all of the "rights, duties, defenses, and obligations" that the insurance company had under the relevant insurance policy. See § 631.57(1)(b).

In the case of sinkhole coverage, a contractual "appraisal" method to adjust the claim has evolved alongside other statutory requirements. See Fla. Ins. Guar. Ass'n v. Branco, 148 So. 3d 488, 491, 491-95 (Fla. 5th DCA 2014) ("Appraisals are creatures of contract and the subject or scope of appraisal depends on the contract provisions."); § 627.7074, Fla. Stat. (2009) (providing for nonbinding, neutral evaluation as an alternative dispute resolution process for disputes over sinkhole coverage and loss). This "appraisal" is not similar to the normal "appraisal" process used to place a fair market value on a parcel of property. Instead, the appraisers often determine the nature of the sinkhole that is damaging the home and the appropriate repair method to

- 14 -

address that specific sinkhole. The cost of subsurface and surface repairs is driven by the repair method that the appraisers select. It is my impression that the appraisers in this context develop expertise and can more rapidly and efficiently evaluate these complex claims than could a jury of inexperienced lay persons.

Admittedly, the method of paying and the amount of the payment of a "covered claim" by FIGA may vary from the payments that would be made by the insurance company under the insurance contract but for the insolvency. Still, it seems to me that the appraisal mandated by the insurance policy is, in general, a logical and compatible method to help determine the "unpaid claim" that arises out of the insurance contract, which in turn is used to define the "covered claim" that ultimately measures the guaranty payment under section 631.57.[3] To a large extent, the amount normally payable under an insurance policy for a sinkhole claim and the cost of the "actual repair" of the loss are similar. To the extent that they differ, I do not understand why the appraisers cannot accommodate the difference. The fact that the FIGA payment is not paid directly to the policyholder and that the timing of the payment may vary does not seem to me to be a difference that renders the contractual appraisal process incompatible or unworkable when adjusting a covered claim that will be protected by FIGA.

---

[3]Admittedly, my understanding of the appraisal process may not be entirely correct. My understanding of this process is limited because these appeals typically come to this court on interlocutory orders compelling appraisal. Since that is the case here, the record is sparse and does not have any transcript of an evidentiary hearing determining whether appraisal under the policy is or is not inconsistent with FIGA's responsibility to pay covered claims.

- 15 -

If appraisal is not used to determine the unpaid claim in this context, then some other method must be used. The only other method I am aware of is trial by judge or jury. That does not seem to be a method that resolves the concerns about whether the payment is not made directly to the insured or when the payment is made. FIGA generally is not responsible to pay the attorneys' fees of the homeowner. If the appraisal process does not apply when the insurance company becomes insolvent, the homeowner is unlikely to be able to afford to litigate the amount of an unpaid claim. The financial protection and the economic stability intended by the legislature in these statutes may be illusory if FIGA is not obligated to adjust sinkhole claims using the methods prescribed by the relevant insurance policy.