# Supreme Court of Florida

_____

No. SC15-519
_____

**LEANDRO DE LA FUENTE, et al.,**
Petitioners,

vs.

**FLORIDA INSURANCE GUARANTY ASSOCIATION,**
Respondent.

[October 20, 2016]

CANADY, J.

In this case, we consider the scope of the liability of the Florida Insurance Guaranty Association (FIGA) for sinkhole losses. We address two questions that turn on whether the scope of FIGA's obligations is determined by the statutory provisions in effect when the policyholder's policy was issued in 2009 or the more restrictive provisions in effect when the insurer was adjudicated insolvent in 2011.

We have for review the decision in Florida Insurance Guaranty Ass'n v. de la Fuente, 158 So. 3d 675, 681 (Fla. 2d DCA), review granted 171 So. 3d 115 (Fla. 2015), in which the Second District Court of Appeal ruled upon the following

questions certified under article I, section 3(b)(4) of the Florida Constitution to be of great public importance:

> I. DOES THE DEFINITION OF "COVERED CLAIM" IN SECTION 631.54(3), FLORIDA STATUTES, EFFECTIVE MAY 17, 2011, APPLY TO A SINKHOLE LOSS UNDER A HOMEOWNERS' POLICY THAT WAS ISSUED BY AN INSURER BEFORE THE EFFECTIVE DATE OF THE NEW DEFINITION WHEN THE INSURER WAS ADJUDICATED TO BE INSOLVENT AFTER THE EFFECTIVE DATE OF THE NEW DEFINITION?
>
> II. DOES THE STATUTORY PROVISION LIMITING FIGA'S MONETARY OBLIGATION TO THE AMOUNT OF ACTUAL REPAIRS FOR A SINKHOLE LOSS PRECLUDE AN INSURED FROM OBTAINING AN APPRAISAL AWARD DETERMINING THE "AMOUNT OF LOSS" IN ACCORDANCE WITH THE TERMS OF THE HOMEOWNERS' POLICY OF INSURANCE?

The Second District answered both questions in the affirmative.

Regarding the first question, the district court held that the statutory definition of "covered claim" effective on the date of an insurer's adjudicated insolvency determines the scope of FIGA's statutory liability to insureds for sinkhole loss. de la Fuente, 158 So. 3d at 679-80. So the Second District concluded that in this case the 2011 statutory definition effective at the time of Petitioners' "covered claim" of sinkhole loss limits FIGA's coverage to the actual cost of repair up to the insurance policy's limits. Id. at 680-81. Answering the second question, the district court concluded that the 2011 statute precludes

- 2 -

insureds from obtaining an appraisal award for their sinkhole loss directly from FIGA under the terms of their HomeWise insurance policy.  Id.

For the reasons explained below, we agree with the Second District Court and answer both questions in the affirmative.[1]

## I. BACKGROUND

Leandro de la Fuente and Ana Delia Garcia insured their Tampa home with a policy from HomeWise Preferred Insurance Company (HomeWise) for one year, beginning on May 7, 2009.  Id. at 676.  The policy included coverage for "sinkhole loss," the determination of which requires the presence of structural damage to the home resulting from "sinkhole activity." [2]  On March 1, 2010, the insureds notified HomeWise of loss on the insured property from sinkhole activity that was first noticed in June 2009.  HomeWise denied the claim in May 2010 after hiring HSA Engineers and Scientists (HSA) to inspect the property.

---

1. Petitioners also raised in this review a number of constitutional claims under the U.S. and Florida Constitutions.  The Second District Court did not address these issues, and the record shows that Petitioners did not properly preserve them.  We decline to address these claims.  See Chames v. DeMayo, 972 So. 2d 850, 853 n.2 (Fla. 2007).

2. Both the 2011 and the 2009 statutes similarly define "sinkhole loss" as "structural damage to the covered building, including the foundation, caused by sinkhole activity," except the word covered is not in the 2009 statute. § 627.706(2)(j), Fla. Stat. (2011); § 627.706(2)(c), Fla. Stat. (2009).

- 3 -

HomeWise advised the insureds, however, that under Florida law, they could obtain additional subsurface testing on the property and that they could request a neutral evaluation of their claim. See §§ 627.707, 627.7074, Fla. Stat. (2009). The homeowners requested such testing and in the summer of 2010 obtained a neutral evaluation from W.A. Neumann Construction, Inc. HSA also conducted additional testing and revised its conclusion, finding that sinkhole activity was present on the property. Nevertheless, HSA determined the home did not incur "structural damage" from such activity, and HomeWise again denied the claim.

Before HomeWise denied the claim a second time, the insureds in November 2010 filed suit in circuit court against their insurer in a one-count complaint for breach of the homeowners' insurance contract. The insureds alleged that HomeWise failed to pay them for damage to their home from sinkhole loss under the terms of the HomeWise insurance policy. HomeWise answered, denying the breach and raising defenses. But then HomeWise became insolvent, and FIGA entered the case.

> On September 2, 2011, the Leon County Circuit Court entered an order appointing the Florida Department of Financial Services [FDFS] as receiver for HomeWise, entering an injunction, and imposing an automatic stay in favor of HomeWise. On November 4, 2011, the Leon County Circuit Court entered an order adjudicating HomeWise to be insolvent. As a result of HomeWise's adjudication of insolvency, FIGA was activated to handle the "covered claims" (as defined by statute) of the insolvent insurer in accordance with sections 631.50 through 631.70, Florida Statutes (2011), the Florida Insurance Guaranty Association Act (the FIGA Act).

- 4 -

After HomeWise was adjudicated to be insolvent, the insureds filed an amended complaint that substituted FIGA as the defendant in place of HomeWise. FIGA answered the amended complaint, noting that its obligations were limited to the payment of "covered claims" within the meaning of the FIGA Act.

On May 16, 2012, FIGA wrote the insureds and notified them that it had determined that sinkhole activity was a cause of damage to their residence. FIGA included with its letter a report from its consultant outlining the scope of the recommended repairs and the cost of accomplishing them. FIGA offered to issue payment for ground stabilization and cosmetic repairs to the residence once the insureds provided FIGA with executed contracts with contractors for the completion of the necessary repairs. However, the insureds did not proceed with obtaining the requested contracts because their consultant disagreed with FIGA's consultant concerning the appropriate method for the repair of the residence. The method recommended by the insureds' consultant was substantially more costly than the method recommended by FIGA's consultant.

de la Fuente, 158 So. 3d at 676-77 (footnote omitted).

In November 2012, the insureds sent FIGA a letter demanding appraisal of the sinkhole loss under the terms of their HomeWise insurance policy. Id. at 677. The insurance policy provision required each party to the contract—the insurer and the insureds—separately to obtain an appraisal of the sinkhole loss. If the appraisers did not agree on the amount, they would jointly choose an umpire, and the amount of loss would be determined by agreement of any two of the three. Id. The insurance policy provided that the amount of loss determined under this appraisal process was to be paid by the insurance company directly to the insureds. Attached to the letter were the estimates from Petitioners' experts for subsurface remediation requiring both underground grouting and underpinning. FIGA's

- 5 -

expert estimated subsurface remediation of grouting only and included cosmetic repairs. FIGA's attorney then offered payment for implementation of its remediation plan upon Petitioners' execution of contracts for the repairs in accordance with the 2011 amended statutory definition of "covered claim." Id.

> Over FIGA's objection, the circuit court ordered appraisal [under the insurance policy of the sinkhole loss] and compelled FIGA to participate. On May 1, 2013, the appraisers entered their award determining the amount of the loss to be $130,600. The appraisal award included a line item for future incurred costs for additional living expenses that was left open. The insureds promptly filed a motion asking the circuit court to confirm the appraisal award and to enter judgment against FIGA on the award. FIGA objected to the confirmation of the appraisal award on the ground that the [statutory] definition of "covered claim" in effect [in 2011] when HomeWise was adjudicated insolvent applied to the insureds' sinkhole loss and should govern any payments made on the claim. The application of the new definition of "covered claim" to the insureds' claim would prohibit any direct payment to the insureds for a sinkhole loss.
> The circuit court rejected FIGA's argument and ruled that the law in effect when the policy was issued [in 2009] would determine the scope of FIGA's payment obligation together with the loss payment provisions in the policy. In accordance with this ruling, the circuit court entered an amended final judgment confirming the appraisal award and entering judgment in favor of the insureds and against FIGA in the amount of $130,600.

Id. at 678.

On appeal, the insureds "argue[d] that their rights to recover against FIGA [for sinkhole loss] were established and vested in May 2009 when HomeWise issued the subject insurance policy." Id. The Second District Court addressed the issue of which statutory definition of "covered claim" applied to Petitioners' claim

- 6 -

and reversed the trial court's judgment. Approving the First District Court's opinion in Florida Insurance Guaranty Ass'n v. Bernard, 140 So. 3d 1023 (Fla. 1st DCA), review denied, 157 So. 3d 1041 (Fla. 2014), the Second District held as follows:

> We agree with the analysis and the holding in Bernard. Accordingly, we hold that the definition of "covered claim" in effect on November 4, 2011, the date that HomeWise was adjudicated to be insolvent, governs the scope of FIGA's liability to the insureds for the sinkhole loss at their property. In accordance with this holding, we reverse the amended final judgment that requires FIGA to pay $130,600 directly to the insureds.
> In addition, we reverse the amended final judgment's confirmation of the appraisal award. Under the 2011 definition of "covered claim," the policy provisions that authorize appraisal and require payment of the appraisal award directly to the insured (or other authorized person) within sixty days of the filing of the award are inapplicable to a sinkhole loss once FIGA is activated.

de la Fuente, 158 So. 3d at 679-80. The Second District court then certified to this Court the two questions cited above that concern the applicability of the statutory definition of "covered claim" to determine an amount of loss and the scope of FIGA's obligations regarding "covered claims." Id. at 681. We address these questions below.

## II. ANALYSIS

We begin by explaining what FIGA is and its role when certain insurers become insolvent. FIGA, the respondent in this case, is made up of "[a]ll insurers defined as member insurers . . . as a condition of their authority to transact

- 7 -

insurance in this state." § 631.55, Fla. Stat. (2011). The statutory purposes of the

FIGA Act are to

>    (1) Provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer;
>    (2) Assist in the detection and prevention of insurer insolvencies;
>    (3) Create a nonprofit corporation to administer and supervise the operation of such association; and
>    (4) Assess the cost of such protection among insurers.

§ 631.51, Fla. Stat. (2011); see 631.57, Fla. Stat. (2011) (providing the powers of

FIGA). At issue in this case is FIGA's provision of "a mechanism for the payment

of covered claims," resulting from an insurer's insolvency. § 631.51, Fla. Stat.

(2011). We have previously described FIGA and its powers and duties as follows:

>    FIGA is a public, nonprofit corporation created by statute to provide a mechanism for payment of covered claims under certain classes of insurance policies issued by insurers which have become insolvent. Under Florida's statutory insurer liquidation system, when an insurer becomes insolvent, FIGA becomes obligated to respond to covered claims that arise prior to adjudication of the insurer's insolvency and within a specified period after insolvency. "FIGA is strictly a creature of statute." "Thus, 'the statutory language defines the extent of FIGA's obligations. FIGA is not responsible for claims against an insurer that do not fall within FIGA's statutory obligations.' " The FIGA act is expressly designed to protect the insured, rather than the insurance industry. However, "the full gamut of a defunct insurance company's liabilities was not intended to be shifted onto FIGA."

FIGA v. Devon Neighborhood Ass'n, Inc., 67 So. 3d 187, 189-90 (Fla. 2011)

(citations and footnote omitted).

The statute at issue here is section 631.54(3), Florida Statutes (2011), in which the Legislature amended the definition of "covered claim" to limit FIGA's financial responsibility for sinkhole loss. Because we address questions of law, our review is de novo. Kasischke v. State, 991 So. 2d 803, 807 (Fla. 2008).

## A. FIRST CERTIFIED QUESTION: WHICH DEFINITION OF "COVERED CLAIM" APPLIES?

As explained above, when an insurer becomes insolvent, as HomeWise did in the instant case, FIGA assumes certain statutory duties regarding "covered claims," effectively providing a limited statutory safety net for the insured. The first certified question asks which statutory definition of "covered claim" applies to the insureds' sinkhole loss claim—the definition in effect when Petitioners' insurance policy issued or the definition in effect when their insurer was declared insolvent.

Petitioners argue that upon their insurer's insolvency, FIGA was bound under the terms of the 2009 HomeWise insurance contract, effectively stepping into the shoes of their insurer from the date the policy issued. They thus claim their "right" to recover against FIGA vested in 2009. de la Fuente, 158 So. 3d at 678. And as a result, they conclude that the 2009 statutory definition of "covered claim" in section 631.54, applies to their claim of sinkhole loss, and that the district court's application of the 2011 statute, constituted an invalid retroactive application of the law. We disagree.

The provision chiefly at issue in this case is the statutory definition of "covered claim" in section 631.54(3).  This statute defines FIGA's obligation to insurance claimants for "covered claims" when an insurer becomes insolvent.  The 2009 definition in effect at the time the insurance policy issued consisted of subsections (3)(a)-(b) of the statute.  But at the time of the insurer's 2011 insolvency, this statute had been amended with the addition of paragraph (3)(c). [3] Under the 2011 statute, the term "covered claim" was defined as follows:

> (3)  "Covered claim" means an unpaid claim, including one of unearned premiums, which arises out of, and is within the coverage, and not in excess of, the applicable limits of an insurance policy to which this part applies, issued by an insurer, if such insurer becomes an insolvent insurer and the claimant or insured is a resident of this state at the time of the insured event or the property from which the claim arises is permanently located in this state.  For entities other than individuals, the residence of a claimant, insured, or policyholder is the state in which the entity's principal place of business is located at the time of the insured event.  The term does not include:
> (a)  Any amount due any reinsurer, insurer, insurance pool, or underwriting association, sought directly or indirectly through a third party, as subrogation, contribution, indemnification, or otherwise;
> (b)  Any claim that would otherwise be a covered claim under this part that has been rejected or denied by any other state guaranty fund based upon that state's statutory exclusions, including, but not limited to, those based on coverage, policy type, or an insured's net worth.  Member insurers have no right of subrogation, contribution, indemnification, or otherwise, sought directly or indirectly through a third party, against the insured of any insolvent member; or

---

3. Subsection (3)(b) also was amended in 2011 to expand the exclusions from the definition of "covered claim," but these changes do not affect our analysis.

- 10 -

(c)  Any amount payable for a sinkhole loss other than testing deemed appropriate by the association or payable for the actual repair of the loss, except that the association may not pay for attorney's fees or public adjuster's fees in connection with a sinkhole loss or pay the policyholder.  The association may pay for actual repairs to the property but is not liable for amounts in excess of policy limits.

§ 631.54(3), Fla. Stat. (2011) (emphasis added).

The 2011 amended statute does not prohibit FIGA from paying for a "covered claim" of sinkhole loss.  But the plain language of section 631.54(3)(c), Florida Statutes (2011), does expressly limit how FIGA "covers" the claim.  The district court correctly explained as follows:

> The effect of the 2011 amendment to the definition of "covered claim" is to prohibit FIGA from paying an insured directly for a sinkhole loss.  Instead, FIGA may only pay a contractor for the "actual repairs to the property" for such a loss up to the amount of the policy limits and the statutory limits on FIGA's obligations to pay, whichever is less.  Thus the 2011 amendment to the definition of "covered claim" is not a mere technical change; instead, the amendment substantially changes the method by which sinkhole losses will be handled and paid by FIGA.

158 So. 3d at 679.  Under the revised statute, FIGA may not directly pay insureds a lump sum of money for sinkhole loss, which the insured might or might not use for its intended purpose—repair of the damage.  Instead, the amended statute requires FIGA to pay for "the actual repair of the loss" not exceeding the policy's limits.

In arguing that application of the 2011 amended statute to their claim would constitute a retroactive application of the statute that impairs rights vested under the earlier statute, the insureds rely on two prior opinions from this Court—Hassen

- 11 -

v. State Farm Mutual Automobile Insurance Co., 674 So. 2d 106 (Fla. 1996), and

Menendez v. Progressive Express Insurance Co., 35 So. 3d 873, 874 (Fla. 2010).

In Hassen, an automobile insurance case, this Court determined that a statutory

amendment to an underinsured motorist carrier's right to subrogation must be

applied prospectively. 674 So. 2d at 108. We explained that our ruling was

consistent with the "well established rule of statutory construction that, in the

absence of an express legislative statement to the contrary, an enactment that

affects substantive rights or creates new obligations or liabilities is presumed to

apply prospectively." Id. We observed that "it is generally accepted that the

statute in effect at the time an insurance contract is executed governs substantive

issues arising in connection with that contract." Id. Similarly, in Menendez, an

automobile insurer failed to pay the insured the personal injury protection (PIP)

benefits under the policy, and the circuit court ruled in the insured's favor. The

district court reversed, holding that the insured failed to comply with new statutory

presuit notice requirements for injured persons seeking to recover PIP benefits.

Menendez, 35 So. 3d at 874. But this Court quashed the district court's decision,

and held that the new presuit provisions constituted a substantive change to the

statute that "[could not] be retroactively applied to insurance policies issued before

the effective date of the amendment." Id. at 875.

- 12 -

Petitioners' reliance on these cases is unavailing. The issues decided in those cases concerned the rights of the insured and the duties of the insurer under an insurance contract. FIGA was not and is not a party to Petitioners' insurance contract. FIGA, as we stated above, is "strictly a creature of statute." Fla. Ins. Guar. Ass'n, Inc. v. All The Way With Bill Vernay, Inc., 864 So. 2d 1126, 1129-30 (Fla. 2d DCA 2003). "[T]he statutory language defines the extent of FIGA's obligations," and "FIGA is not responsible for claims against an insurer that do not fall within FIGA's statutory obligations." Id. at 1130. As a result, the Florida Legislature—not the insurance policy—determines what coverage, if any, FIGA provides to those who experience a covered loss within the meaning of the statute in effect when their insurer is declared insolvent. Although, as Petitioners point out, section 631.53, Florida Statutes, requires that "[t]his part shall be liberally construed to effect the purposes set forth in s. 631.51, [Florida Statutes]," this does not mean that the Court may ignore the plain meaning of the statutes defining FIGA's statutory obligations.

Previously, the First District in Bernard addressed the same issues raised here. 140 So. 3d at 1024. We find the First District's reasoning persuasive. In that case, Bernard found sinkhole damage to her home in November 2010 and submitted a claim to her insurer in December of that year, which the insurer denied despite its confirmation of the insured's claim. Id. at 1025. The homeowner, like

Petitioners here, sued her insurer for breach of the insurance contract. Subsequently, Bernard's insurer was declared insolvent in November 2011. The insured contended that application of the 2011 statutory definition of "covered claim" to her 2010 sinkhole claim constituted an invalid retroactive application of the statute. Id. at 1034. Rejecting that argument, Judge Wetherell reasoned as follows:

> We also have not overlooked Bernard's argument that claims against FIGA should be governed by the general rule, most recently reaffirmed by the Florida Supreme Court in Menendez, that "the statute in effect at the time an insurance contract is executed governs substantive issues arising in connection with that contract." 35 So. 3d at 876. We find that rule inapplicable here because it is derived from cases involving contractual claims under an insurance policy, which are logically, and constitutionally, governed by the law in effect at the time of the contract. See generally Lumbermens Mut. Cas. Co. v. Ceballos, 440 So. 2d 612, 613 (Fla. 3d DCA 1983) (explaining that the application of a statute to insurance contracts entered into prior to the date the statute took effect "would constitute a legislative impairment of contract in violation of article I, section 10 of the Florida Constitution"). By contrast, because the FIGA Act exists as a matter of legislative grace and claims against FIGA are statutory claims based upon its alleged failure to meet its obligations under the FIGA Act, the insured has no cause of action against FIGA that would be protected against changes to the FIGA Act until the insurer is adjudicated insolvent.

Id. at 1033.

In reaching this conclusion, Bernard noted that other states have enacted provisions that—like the Florida statute—are "patterned after a Model Act promulgated by the National Association of Insurance Commissioners." Id. at

1026.  As the Bernard court explained, the courts in states with these similar laws have "uniformly held that the definition of 'covered claim' in effect when the insurer is adjudicated insolvent is the applicable definition." Id. at 1028-31 (citing cases).  For example, Bernard cited Durish v. Channelview Bank, 809 S.W.2d 273, 275-77 (Tex. Ct. App. 1991).  In that case, the Texas court held that a "covered claim" under the Texas Property and Casualty Insurance Guaranty Act is determined by the date of the insurer's impairment, that is, its insolvency.  The court explained that prior to an insurer's insolvency, an insured has only an "expectancy that if the insurer became impaired, then it might have a covered claim against the [Guaranty] Fund at that time." Durish, 809 S.W.2d at 277 (first emphasis added).  Such an expectancy cannot be the basis for a claim of vested rights.  See Fla. Hosp. Waterman, Inc. v. Buster, 984 So. 2d 478, 490 (Fla. 2008) (" '[T]o be vested, a right must be more than a mere expectation based on an anticipation of the continuance of an existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand . . . .' " (quoting Div. of Workers' Comp. v. Brevda, 420 So. 2d 887, 891 (Fla. 1st DCA 1982)).  When obtaining an insurance policy, the policy holder obtains no vested right to a future government bailout if the insurer becomes insolvent.

We agree with FIGA and the First and Second District Courts: FIGA's duty to an insured arises under the statute applicable at the time an insurer is declared

insolvent and the insured is determined to have a "covered claim." See §§ 631.55-.57, Fla. Stat. The insurer's insolvency triggers FIGA's statutory duties. FIGA assumes no contractual duties absent statutory direction. As a result, in this case, the definition of "covered claim," in section 631.54(3), Florida Statutes (2011), applies to Petitioners' sinkhole loss claim, and the amended Florida statute is applicable prospectively—not retroactively as Petitioners claim. We thus approve the Second District's decision and its reasoning, and we answer the first certified question in the affirmative.

## B. SECOND CERTIFIED QUESTION: IS AN APPRAISAL AWARD PRECLUDED?

In this case, the circuit court ordered an appraisal of loss under the insurance policy to be awarded directly to Petitioners despite FIGA's offer to pay for repairs to the insureds' home upon their execution of contracts for the repairs. de la Fuente, 158 So. 3d at 678. The Second District reversed on this point, determining that the 2011 statutory definition of "covered claim" in effect at the time the homeowners' insurer was liquidated applied. Id. at 679-80. The insurance policy's appraisal provisions therefore did not apply to a sinkhole loss once FIGA was activated. Id. at 680. In so holding, the Second District adopted the First District's reasoning in Bernard and held that "requiring FIGA to participate in the [insurance policy's] appraisal process is at odds with FIGA's statutory mandate to

- 16 -

pay only for the actual cost of repair for a covered sinkhole loss." de la Fuente, 158 So. 3d at 680-81.

Subsequently, the Second District reinforced this determination in Florida Insurance Guaranty Ass'n, Inc. v. Waters, 157 So. 3d 437, 439 (Fla. 2d DCA 2015). Relying on its decision in the instant case, the Second District, reaffirmed that "application of the 2011 definition of 'covered claim' prohibits 'FIGA from paying an insured directly for a sinkhole loss.' " Id. That provision also limits FIGA to paying for " 'actual repairs' . . . up to the amount of the policy limits and the statutory limits on FIGA's obligations to pay, whichever is less." Id. (quoting de la Fuente, 158 So. 3d at 679).

We therefore answer the second certified question in the affirmative. The limitation on FIGA's monetary obligation to payment for actual repairs of a sinkhole loss precludes an insured from obtaining an appraisal award under the terms of the insurance policy as to which FIGA is not a party. FIGA's responsibilities are contained in the statute, not the homeowners insurance policy.

### III. CONCLUSION

FIGA's obligations to a policy holder are statutory obligations that do not come into play until an insurer has been adjudicated insolvent. And a policyholder's rights against FIGA cannot become vested prior to the triggering of FIGA's obligations by the adjudication of the insurer's insolvency. So the claim

- 17 -

here was governed by the definition of "covered claim" in the 2011 statute. We

therefore answer both certified questions in the affirmative and approve the Second

District's decision in this case.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal – Certified Great Public Importance

Second District - Case No. 2D13-3543

(Hillsborough County)

Robert Erich Biasotti and Christine R. O'Neil of Biasotti and Associates, St. Petersburg, Florida,

for Petitioners

G. William Bissett, Jr. of Kubicki Draper, PA, Miami, Florida,

for Respondent

George Alexander Vaka and Nancy Ann Lauten of the Vaka Law Group, P.L., Tampa, Florida,

for Amicus Curiae United Policyholders

Kirsten Hope Matthis, Timothy Jon Meenan, Jr. and Thomas Porter Crapps of Meenan, P.A., Tallahassee, Florida,

for Amicus Curiae National Conference of Insurance Guaranty Funds